UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| D.W., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 18-1824 (CRC) |
| v. | ) |
| | ) |
| THE DISTRICT OF COLUMBIA | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs D.W., a minor child, and his mother, Arika Woodson (collectively, Plaintiffs), respectfully move this Court, pursuant to Fed. R. Civ. P. 56, to enter judgment in their favor on the one count in their complaint. This action is an appeal of a May 18, 2018, Hearing Officer Determination. Plaintiffs contend that the Hearing Officer erred in interpreting the Special Education Student Rights Act of 2014, D.C. Code §§ 38-2571.02 – 38-2573.01, to preclude Ms. Woodson's designee with expertise in education from observing D.W. in his current educational placement and testifying about what he observed in any subsequent due process proceedings on behalf of D.W.

In support of this motion, Plaintiffs respectfully refer the Court to the accompanying Memorandum of Points and Authorities, Statement of Material Facts as to Which There is No Genuine Dispute, the administrative record filed on November 30, 2017, and exhibits.

Respectfully Submitted,

/s/ Caroline Wick
Caroline J. Wick*
Senior Attorney
Children's Law Center
501 3rd Street NW, 8th Floor

1

Washington, DC 20001
Phone: (202) 467-4900 x. 555
Fax: (202) 467-4949
Email: cwick@childrenslawcenter.org

*Authorized to practice under LcVR 83.2(g)*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| D.W., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 18-1824 (CRC) |
| v. | ) |
| | ) |
| THE DISTRICT OF COLUMBIA | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'</u> <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs D.W., a minor child, and his mother, Arika Woodson (collectively, Plaintiffs),

respectfully submit that there are no material issues of fact in dispute and that they are entitled to

the entry of judgment in their favor and against the District of Columbia (the District) on their

complaint. Plaintiffs contend that the Hearing Officer erred in interpreting the Special Education

Student Rights Act of 2014 (Student Rights Act), D.C. Code §§ 38-2571.02 – 38-2573.01, to

preclude Ms. Woodson's designee with expertise in education from observing D.W. in his

current educational placement and testifying about what he observed in any subsequent due

process proceedings on behalf of D.W.

## I.    Background

The facts upon which Plaintiffs rely are provided in the accompanying Statement of

Material Facts as to Which There is No Genuine Dispute, which is based upon the administrative

record. Plaintiff D.W. is currently a nine-year-old, fourth grade student who receives specialized

instruction under the Individuals with Disabilities Education Improvement Act of 2004, 20

1

U.S.C. §§ 1400 – 1482 (IDEIA).[1] D.W. currently attends, and has attended, District of Columbia Public Schools (DCPS) since August 2013. *R.* at 145. D.W. has multiple disabilities, including global developmental delays, Angelman Syndrome, and Agenesis of the Corpus Callosum. *Id.* at 7. Academically and developmentally, D.W. is several years behind his same-aged peers. *Id.* at 153. D.W.'s receptive language skills are more advanced than his expressive language skills; expressively he has presented as nonverbal, though he has some communication skills. *Id.* at 59.

Beginning in August 2013, the District placed D.W. in a self-contained classroom at a general education school. *Id.* at 145. In second grade (2016-2017 school year), D.W. remained placed in the self-contained classroom inside a general education school.[2] *Id.* at 104. D.W. spent his day in a classroom with disabled peers; however, he attended a school that also taught typically developing students. *Id.* at 59. When D.W. reached the end of second grade, the District notified Ms. Woodson that at the start of the third grade (2017-2018 school year), D.W. would be removed from the general education school and placed in a school that only serves disabled students. *Id.* at 62, 64.

Ms. Woodson opposed removing D.W. from a school that serves typically developing students and she had a specific concern about the proposed school: it contains a pool, which is extremely dangerous for students diagnosed with Angelman Syndrome. *Id.* at 62. When the District and Ms. Woodson could not reach an agreement about D.W.'s placement for the start of D.W.'s third grade year, Ms. Woodson filed a due process complaint (hereinafter 2017 DPC)— separate from the due process complaint at issue in this appeal—to challenge the District's

---

[1] The Individuals with Disabilities Act (IDEA) was originally passed in 1997. In 2004, Congress re-authorized IDEA and named it the Individuals with Disabilities Improvement Act (IDEIA). The acronyms IDEA and IDEIA are often used interchangeably to refer to the re-authorized legislation passed in 2004.

[2] For full context of the instant matter, this motion provides facts that preceded the initiation of the due process complaint at issue here, including reference to prior, related litigation.

decision to place D.W. in a special education school. *Id.* at 56. While the 2017 DPC was pending, the District and Ms. Woodson agreed that D.W. would be placed in a self-contained classroom in a different general education school to comply with the "stay put" provisions of IDEIA.[3] *Id.* at 63, 183.

After D.W. started at the new school, Ms. Woodson asked that her designee with expertise in education, Dr. Paul Livelli, observe D.W. in his new placement pursuant to the Student Rights Act. *Id.* at 194-95. The District refused Ms. Woodson's request. *Id.* at 193-95. Ms. Woodson filed a Motion requesting that her designee be allowed to observe D.W. in the new placement. *Id.* at 181-95. The Hearing Officer denied Ms. Woodson's Motion at the start of the due process hearing; the Hearing Officer found that Ms. Woodson sought the observation order for the purpose of litigation and that the designee "has at least a potential financial interest in the outcome of that litigation." *Id.* at 58.

The Hearing Officer issued his determination on November 4, 2017, addressing the District's proposed placement of D.W. at a day school only for students with disabilities. *Id.* at 55-74. The Hearing Officer found that the District denied D.W. a Free, Appropriate Public Education (FAPE) by proposing to place D.W. in a more restrictive environment without assessing and understanding D.W.'s needs. *Id.* at 68. The Hearing Officer noted that D.W. might have been able to stay at the first general education school he was placed at if the District had put

---

[3] When a parent exercises their right to request an administrative due process hearing, IDEIA requires that "the child shall remain in the then current educational placement" until the proceedings resolve. 20 U.S.C. § 1415 (j). Ms. Woodson filed a motion for "Stay Put" protections to ensure that the District would not change D.W.'s placement—in this case to a more restrictive placement—while her due process complaint was adjudicated. R. at 56. D.W. could not remain at the same school he attended when the due process complaint was filed because he aged out of the self-contained classroom at that school; however, Ms. Woodson and the District agreed that D.W. would be placed in a self-contained classroom in a different general education school. *Id.* at 178. Ms. Woodson withdrew her motion when she and DCPS reached this agreement. *Id.* at 56.

3

in place assistive technology and other accommodations. *Id*. The Hearing Officer ordered that the District conduct an Assistive Technology Evaluation and a Psychological Evaluation and that the District review and revise D.W.'s Individualized Education Program ("IEP") in light of the evaluations. *Id*. at 69.

The District completed the two evaluations in November and December 2017. *Id*. at 143-55, 218-25. The Psychological Evaluation includes three observations of D.W in the classroom by the school psychologist, a District employee. *Id*. at 149-51. The Assistive Technology Evaluation includes two observations of D.W. in the classroom by the Specialist in Assistive Technology, also a District employee. *Id*. at 221-22. On December 12, 2017, Ms. Woodson requested that her designee with expertise in education likewise be allowed to observe D.W. "to help inform [Ms. Woodson's] participation in the special education process at an upcoming meeting to review evaluations and discuss his performance." *Id*. at 217. The District refused to allow the observation citing the November 2017 Hearing Officer Determination (HOD). *Id*.

On January 22, 2018, the District convened a meeting to review D.W.'s evaluations. *Id*. at 9. Ms. Woodson's participation in the meeting was limited by the fact that her designee with expertise in education had not been allowed to observe D.W. in the classroom. because she wanted someone who did not work for the District to observe D.W. *Id*. at 1081. The District, on the other hand, had multiple staff members who worked with D.W. on a regular basis in the school setting—including two teachers and the District representative—as well as two evaluators present at the meeting who had observed D.W. in the classroom. *Id*. at 492-93, 511-21. After the IEP meeting, the District provided Ms. Woodson with an Amended IEP that included a new page and indicated D.W.'s placement was a separate day school. *Id*. at 9-10. However, D.W. did not

4

move to the special education school and remained placed in the self-contained classroom at the general education school. *Id.* at 7.

On February 2, 2018, Ms. Woodson filed the due process complaint (hereinafter 2018 DPC) that initiated the proceedings in this appeal. *Id.* at 18-32. The 2018 DPC was heard by a different Hearing Officer than the 2017 DPC. *Id.* at 13, 70. Ms. Woodson raised one issue: "that [the District] ha[d] denied [D.W.] a FAPE by failing to allow the Parent to have her expert observe [D.W.] in his current classroom as she is entitled to under the Student Rights Act." *Id.* at 28.

After multiple motions were filed, an evidentiary hearing was held on May 8, 2018. *Id.* at 3-6. The hearing involved a sole issue: "Did [the District] deny the [Ms. Woodson's] expert an opportunity to observe the Student's classroom in violation of the Special Education Student Rights Act, located at D.C. Code Sect. 38-2571.03 (5)(A)?" *Id.* at 7. Plaintiffs presented three witnesses: Dr. Paul Livelli; Ms. Woodson, and Mr. Richard Weinfeld, the Executive Director of the organization for which Dr. Livelli works (Weinfeld Education Group, "WEG"). *Id.* at 6. Dr. Livelli was admitted as an expert in special education programming and placement. *Id.* at 1004. He testified that he is an independent educational consultant who subcontracts for WEG. *Id.* at 1004-05. He also testified about the importance of observations to his work and that his opinion is not based on the parent's wishes, but rather on the data he collects from observations. *Id.* at 1005, 1015. Dr. Livelli noted that he has never accepted a contingency fee agreement. *Id.* at 1013. Mr. Weinfeld likewise testified that WEG has never accepted a contingency fee agreement. *Id.* at 1038-39. Ms. Woodson testified that she requested that Dr. Livelli observe D.W. and that she had wanted a non-District employee to observe D.W. before the January 22, 2018, IEP meeting. *Id.* at 1079-81. Respondent presented one witness, a compliance case

5

manager for the District. *Id.* at 6. The witness testified in part about DCPS's receipt of requests

for attorney's fees from Children's Law Center for services rendered for clients who previously

prevailed in due process litigation. *Id.* at 1070-71.

On May 18, 2018, the Hearing Officer issued his determination. *Id.* at 3-17. The Hearing

Officer ruled:

1. [Ms. Woodson's] request for [Dr. Livelli] to observe the Student at Student's school is granted;
2. Before this observation, DCPS may require Witness A to sign a document under oath affirming that he will not use the information obtained through the observation: 1) in any subsequent special education litigation against DCPS; and 2) in an effort to retain additional clients so that they can engage in special education litigation against DCPS.

*Id.* at 13. The ruling rested on the Hearing Officer's interpretation of a provision of the Student

Rights Act, which states that observers cannot use observations "for the purpose of seeking or

engaging clients in litigation against the District or the LEA." D.C. Code § 38-2571.03 (5)(E).

As a result of the HOD, Plaintiffs filed this appeal, seeking to allow their designee with

expertise in education, Dr. Paul Livelli, to observe D.W. in his current classroom without the

restrictions required by the May 18, 2018, HOD.

## II.    Standard of Review

Here, Plaintiffs challenge a HOD issued after a due process hearing. IDEIA permits

Plaintiffs challenging HODs to appeal to district court. 20 U.S.C. § 1415 (i)(2)(A). When

considering an appeal of a HOD, a court "(i) shall receive the records of the administrative

proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its

decision on the preponderance of the evidence, shall grant such relief as the court determines is

appropriate." *Id.* § 1415 (i)(2)(C). A party challenging a HOD "must at least take on the burden

of persuading the court that the hearing officer was wrong." *Reid ex rel. Reid v. District of*

*Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989)). A summary judgment procedure under IDEIA is "essentially . . . a bench trial based on a stipulated record." *Kelsey v. District of Columbia*, 85 F. Supp. 3d 327, 333 (D.D.C. 2015) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)) (citing *S.B. v. District of Columbia*, 783 F. Supp. 2d 44, 50 (D.D.C. 2011) ("As no new evidence has been submitted here, the Court will treat the parties' cross motions for summary judgment as motions for judgment based on the administrative record.")).

Rather than applying the standard typically applied to Motions for Summary Judgment required by Federal Rule of Civil Procedure 56 (a), courts addressing issues involving IDEIA conduct "summary adjudication[s]." *Kelsey*, 85 F. Supp. 3d at 333 (citing *Phillips v. District of Columbia*, 736 F. Supp. 2d 240, 246 (D.D.C. 2010) ("If no additional evidence is introduced by the parties in a civil suit seeking review of an administrative decision, a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record.") (quoting *Thomas v. District of Columbia*, 407 F. Supp. 2d 102, 109 (D.D.C. 2005))). On review, "[t]he court must resolve factual disputes based upon its own de novo review of the record and evaluation of the preponderance of the evidence, giving 'due weight' to the findings of the IDEA Hearing Officer, depending upon the thoroughness and reasonableness of the administrative proceedings." *Id.* (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).

Here, Plaintiffs challenge a hearing officer's interpretation of state law. Therefore, the applicable standard of review in this case is de novo. *Reid*, 401 F.3d at 521. When a HOD "is predicated solely on the Hearing Officer's legal interpretation of applicable law, without consideration otherwise of the merits of the plaintiff's due process complaint, that decision is entitled to no deference 'since the court draws its own legal conclusions de novo." *L.R.L. ex rel.*

7

*Lomax v. D.C.*, 896 F. Supp. 2d 69, 74 (D.D.C. 2012) (citing *Alexis v. Bd. of Educ.*, 286 F. Supp.

2d 551, 556 (D. Md. 2003) ("The hearing officer's conclusions of law, however, merit no such

deference.")).

**III.  The HOD should be reversed because it violates numerous principles of statutory construction.**

**A.  The HOD is contrary to the plain language of the Student Rights Act.**

Pursuant to D.C. Code § 38-2571.03 (5)(A), a Local Education Agency (LEA, here, the

District) must allow a parent the opportunity to have "a designee appointed by the parent . . .

who has professional expertise in the area of special education" observe "a child's current or

proposed special education program," "provided, that the designee is neither representing the

parent's child in litigation related to the provision of free and appropriate public education for

that child nor has a financial interest in the outcome of such litigation."[4] The statute goes on to

list the types of conditions that an LEA may permissibly impose on the observation and

separately lists restrictions on observers:

> (D) The LEA shall not impose any conditions or restrictions on such observations except those necessary to: (i) Ensure the safety of the children in a program; (ii) Protect other children in the program from disclosure by an observer of confidential and personally identifiable information in the event such information is obtained in the course of an observation by a parent or designee; or (iii) Avoid any potential disruption arising from multiple observations occurring in a classroom simultaneously.

---

[4] On December 12, 2017, when Ms. Woodson requested that her designee with expertise in education in this case, Dr. Livelli, observe D.W., for the second time, there was no litigation concerning D.W. pending against the District. Furthermore, Dr. Paul Livelli, has no financial interested in the "outcome" of any possible special education litigation concerning D.W. against the District. Dr. Livelli signed an affidavit stating that his payment "is not contingent on the outcome of any administrative hearing, legal action, mediation, arbitration, nor the terms of any settlement agreement." R. at 177. In addition, as described above, Dr. Livelli testified that he has never accepted a contingency fee agreement. *Id.* at 1013. Richard Weinfeld, the Executive Director of WEG, testified that WEG has never accepted contingency fee agreements either. *Id.* at 1038. Mr. Weinfeld also testified that WEG does not bill more if an expert's work involves litigation. *Id.* at 1040.

(E) An observer shall not disclose nor use any information obtained during the course of an observation for the purpose of seeking or engaging clients in litigation against the District or the LEA.

*Id.* § 38-2571.03 (5).

The Hearing Officer's reading of the statute in the determination in this case—that an educational expert could observe a child, but not testify in a due process hearing about that child—violates the "familiar" principle of statutory construction that "the starting point for interpreting a statute is the language of the statute itself." *Inner City Broad. Corp. v. Sanders*, 733 F.2d 154, 157 (D.C. Cir. 1984) (citation omitted). The Student Rights Act enumerates three justifications under which an LEA can impose restrictions on an expert's observation. D.C. Code § 38-2571.03 (5)(D). The Student Rights Act also places a limitation on the observer; the observer shall not use any information acquired during the observation for the purpose of seeking or engaging clients in litigation. *Id.* There is no plausible argument in this case that any of these exceptions apply, nor could there be.[5]

The designee with expertise in education here was not trying to use the information he would gain from the observation "for the purpose of seeking or engaging clients"; he had *already been retained* to conduct an observation of D.W. Again, "[s]tatutory construction must begin

_____

[5] The Hearing Officer wrote in the HOD that "during testimony, Witness A [Dr. Livelli] made clear that he did not understand what [the seeking or engaging] clause meant, and indeed indicated that he might use the information use in the observation to engage clients in litigation against DCPS." R. at 12. However, at no time did Dr. Livelli testify that he observes *current* clients for the purpose of finding or soliciting *new* clients. The Hearing Officer asked: "So in your affidavit in P22 in Paragraph 7 it indicates that, I'll just read it. I certify that I have not disclosed and I will not disclose information obtained through course of, during the course of my observations for the purpose of seeking or engaging clients in litigation against the District or the LEA. What does that mean to you?" *Id.* at 1030-31. Dr. Livelli answered: "It means that I have to go in there and with a very open mind and look and determine the type of placement that the child is experiencing, how he is receiving instruction, the type of IEP and supports that he needs and give my honest opinion about that . . . So it really depends on what I see. But I'm not going in there to sue the school system. That's what it means to me." *Id.* at 1031.

9

with the language employed by [the legislature] and the assumption that the ordinary meaning of the language accurately expresses the legislative purpose." *Engine Mfrs. Assn. v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (citation omitted); *see also FCC v. AT&T Inc.*, 562 U.S. 397-403 (2011) ("When a statute does not define a term, [courts] typically 'give the phrase its ordinary meaning.") (quoting *Johnson v. United States*, 559 U.S. 133, 139 (2010)). In relevant part, Merriam-Webster defines "seek" as "1. To resort to; go to. 2. To go in search of; to try to discover. 3. To ask for. 4. To try to acquire or gain; aim at. 5. To make an attempt. 6. To make a search or inquiry." *Seek, Merriam-Webster*, https://www.merriam-webster.com/dictionary/seek (last visited Jan. 9, 2018). Engage is defined as "[t]o employ or involve oneself; to take part in; to embark on." Black's Law Dictionary (10th ed. 2014).[6] In addition, the verbs "seeking or engaging," as opposed to "sought or engaged," connote present action. The statute does not refer to situations where clients were already "sought" or previously "engaged." It certainly does not say that an educational expert who himself was previously engaged by a family cannot use the information he is supposed to observe in any subsequent complaint or litigation against the LEA involving that student.

Considering the ordinary meaning of "seeking" and "engaging," it was improper to place the condition upon the observation that the Hearing Officer did here that "before the observation,

---

[6] Merriam-Webster defines "engage" as: 1. To offer (something, such as one's life or word) as backing to a cause or aim; to expose to risk for the attainment or support of some end. 2. To entangle or entrap in or as if in a snare or bog; to attract and hold by influence or power; to interlock with. 3. To bind (someone, such as oneself) to do something; mesh. 4. To provide occupation for; involve. 5. To arrange to obtain the use or services of; hire; to hold the attention of; engross; to induce to participate. 6. To enter into contest or battle with; to bring together or interlock. 7. To deal with, especially at length. 8. To pledge oneself; promise. 9. To make a guarantee; to begin and carry on an enterprise or activity; to do or take part in something; to give attention to something; deal. 10. To enter into conflict or battle. 11. to come together and interlock. *Engage, Merriam-Webster*, https://www.merriam-webster.com/dictionary/engage (last visited Jan. 9, 2018).

10

DCPS may require Witness A to sign a document under oath affirming that he will not use the information obtained through the observation: 1) in any subsequent special education litigation against DCPS, *involving this Student* or any other student." R. at 12 (emphasis added). The educational expert here was not attempting to observe the student "for the purpose of" searching for, trying to acquire, or employing additional clients; Ms. Woodson had previously asked, and the expert had previously agreed, to observe D.W. to acquire information about D.W., nothing more.

Here, the District never alleged that it was barring Dr. Livelli from observing because he was a threat to the safety, privacy and/or classroom environment of the students in the classroom being observed.[7] Accordingly, the HOD in this matter permits the District to impose a condition on the observation—that the educational expert will not testify about the observation—that the Student Rights Act does not allow for. The plain language of the statute is clear: the District "*shall* not" impose conditions or restrictions unless those conditions or restrictions are needed to protect the safety, privacy, or classroom environment of the students in the classroom being observed.

### B.    The HOD at issue here contravenes the Student Rights Act's legislative history.

Where the words are as plainly written as they are in the Student Rights Act, "resort to legislative history is appropriate only in rare instances," but this court can still "turn to the legislative history of the Act in this case solely to show that . . . it confirms that the use of the

---

[7] When DCPS denied the initial observation request it did so on the basis that Dr. Livelli had been barred from observing during litigation of the 2017 DPC because Dr. Livelli was asked to observe for the purpose of litigation and might have a "financial interest in the outcome of such litigation" (D.C. Code § 38-2571.03 (5)(a)). R. at 217. DCPS did not express any concerns then or during litigation of the 2018 DPC that Dr. Livelli posed a threat to the other students in D.W.'s classroom.

11

word[s]" at issue must mean searching for, trying to acquire, etc. *Inner City Broad. Corp.*, 733 F.2d at 158. There is certainly no indication in the legislative history that the D.C. Council intended "seeking" or "engaging" to mean anything other than their plain meaning. Indeed, the legislative history supports a reading of the Student Rights Act that would permit a parent to get assistance from an educational expert when attempting to understand the scope of their child's needs, to observe and assess the child's educational program, and then have the educational expert testify about that observation if need be at a due process hearing.

The Council passed the Student Rights Act to address the dire state of special education in Washington, D.C., and with the passage of the Student Rights Act, the Council's purpose was to "craft the most dramatic expansion of rights and services for children with disabilities in the history of District Home Rule." D.C. Council, Report on Bill 20-723 at 1 (July 10, 2014).

> 1. **The Council passed the Student Rights Act to help parents of special education students stay informed, engaged, and empowered throughout the special education process.**

The first paragraph of the Council of the District of Columbia Committee on Education Committee Report on the Student Rights Act makes clear the dismal state of the District's public education system and the Council's motivation in enacting the Student Rights Act: "[Washington, D.C.'s] special education system is in a state of crisis. . . . Families feel powerless in ensuring appropriate services for their children. . . . And weak procedural protections result in limited accountability and transparency." *Id.* The report goes on to underscore the importance of the Student Rights Act's procedural protections, which ensure that "parents have the tools they need to stay *informed, engaged, and empowered throughout the special education process.*" *Id.* (emphasis added).

12

In the instant matter, on December 12, 2017, Ms. Woodson requested that her designee with expertise in education observe D.W. in anticipation of an upcoming IEP meeting. R. at 217. The District denied this request. *Id.* At the IEP meeting on January 22, 2018, the District had present multiple school officials who observe D.W. daily and two evaluators who completed a total of five observations of D.W. in the classroom. Ms. Woodson, on the other hand, was not allowed to have her own designee with expertise in education observe D.W. ahead of the IEP meeting, which left her less informed and disempowered—in clear contravention of the Council's intent in passing the Student Rights Act. Moreover, if the IEP meeting had resulted in a placement decision to which Plaintiffs objected and which was not able to be resolved sans litigation, Plaintiffs would have had the statutory right to file a due process complaint seeking a HOD to contest that placement.[8] At the evidentiary hearing, the District would normally call as witnesses some or all of its school officials and evaluators who had observed the student, but under the HOD below, Plaintiffs would not have been allowed to call the one expert it had retained who had the opportunity to observe the child in the classroom. This hardly meets the Council's legislative purpose of "empowering" parents in this process.

> 2.      **The Council identified a Parent's ability to have an expert in education observe their child as a critical tool for the parent to participate in developing and monitoring their child's special education program.**

In a separate section of the Committee Report—"Parental Access to Schools"—the Council describes a parent's ability to observe or to appoint a designee with expertise in education to observe their child as a "*critical tool*" in a parent's participation in developing and

---

[8] The District did issue an Amended IEP following the January 22, 2018, IEP meeting indicating that D.W.'s placement was a separate day school. *Id.* at 9-10. However, D.W. never moved to a separate special education school and remained in the self-contained classroom at the general education school. *Id.* at 7.

13

monitoring their child's special education program. D.C. Council, Report on Bill 20-723 at 3

(July 10, 2014) (emphasis added). The Council noted that at that time, "each [LEA had been

setting] its own standards with respect to the right of a parent to designate an educational expert

to enter their child's classroom on their behalf." *Id.* Furthermore, the Committee acknowledges

that the ability of an expert in education to observe a student is particularly important for parents

of special education students, as parents often do not have the technical expertise to evaluate

their child's educational placement to assess its sufficiency. *Id.*[9]

> ### 3. The Council was concerned that LEAs may limit a parent's ability to observe their child.

The Council also noted that at the time of the Student Rights Act's passage, parents

expressed concern "that an LEA may limit such access to the point that the observation is unable

---

[9] When testifying regarding the importance of observations generally, Mr. Weinfeld stated:

> I just think an observation is a crucial part of the process for having an expert understand exactly what's happening in that classroom, what are the antecedents to the child's behavior, what are the consequences of their behavior, where do they have challenge[s] specifically within the day? What part of a writing lesson or reading lesson are where they start to withdraw and not participate or ask more questions? So it's crucial information for an expert to be able to observe and to be able to inform parents about what's happening in the classroom. Not just to inform parents but to inform the IEP Team. As I mentioned earlier, a very small percentage of [WEG's] cases go to litigation. There may be thoughts that a case is going to end up in litigation but we're able to go back to the IEP table with our observation and often get great results. So to put up a gate to say any parent who is going towards litigation couldn't observe would really limit the information that both the parents and the IEP Team may need to make good decisions about the child.

R. at 1041-42. Dr. Livelli testified regarding why an observation was needed for D.W., specifically: "I would like to collect some information on what is happening in his educational placement, the type of prompts he receives, how independent he is, how he receives instruction from the teacher versus the dedicated aide, if he's queuing off peers, the type of tasks he seems to like to do, how much behavioral intervention is required . . . to see if the assisted technology is making any difference in how he receives instruction and the type of prompting he needs." *Id.* at 1009.

14

to provide meaningful input into their child's educational progress." *Id.* That is exactly what has happened in the instant matter: the District—and later the Hearing Officer—has limited the parent's ability to observe such that the observer can only observe if the observer will *not* testify at a possible subsequent due process hearing. Parents' fears that drove passage of the Student Rights Act are being realized despite the Council's attempts to limit an LEA's ability to restrict observations. The Council also identified the important role expert witnesses play in providing "*significant independent oversight*" which is needed "particularly in communities with the highest need for special education." *Id.* at 6 (emphasis added).

The legislative history of the Student Rights Act readily confirms that a parent's educational expert should be allowed to observe the student at issue, and then testify in subsequent litigation concerning that student. "Where the terms of a statute are unambiguous, further judicial inquiry into the intent of the drafters is generally unnecessary. At the same time, while the immediate statutory text is the best evidence of congressional intent, it is not the *only* such evidence." *Nat. Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) (explaining that "[r]eference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears superficially clear. Here, however, NRDC has presented no persuasive evidence that Congress intended any meaning other than that suggested by a straightforward reading" of the statute at issue.) (internal quotation marks and citations omitted). And given all the statements from the legislative history detailed above, any possible claim that the language of the Student Rights Act is ambiguous – and Plaintiffs certainly contend that it is not – should be resolved in favor of allowing Dr. Livelli to observe D.W. and then to testify about that observation in subsequent litigation about D.W.

15

C.    **The Hearing Officer's interpretation of the Student Rights Act would lead to an unreasonable result or absurd consequence.**

This court should also reject the Hearing Officer's strained interpretation of the Student's Rights Act because "construction of a statute leading to unjust or absurd consequences should be avoided." *Quinn v. Butz*, 510 F.2d 743, 753 (D.C. Cir. 1975). Interpreting D.C. Code § 38-2571.03 (5) to mean that an educational expert (previously retained on behalf of a family) who observes a student at a school cannot testify about that observation, even in litigation regarding that student, is contrary to the Student Rights Act's purpose that is apparent from the statutory text, context, and legislative history.

As discussed above, the Student Rights Act operates in part to ensure parents have access to critical tools in the form of independent experts who can observe their students and provide meaningful input about the child's needs and educational program. D.C. Council, Report on Bill 20-723 at 3 (July 10, 2014). See *supra* p. 13-14 (quoting legislative history). The constrained interpretation at issue here creates a situation that fundamentally thwarts the Council's purpose: families would be forced into a deeply disadvantaged position with respect to their educational expert, especially by comparison to the school. On the one hand, an expert could observe but not testify – meaning that even if after observing the child in his or her placement, the opinion of the family's (previously retained) educational expert is that the program is entirely unsuitable or even damaging for the child, the family would not be able to have that expert testify about that serious problem at a due process hearing. On the other hand, a family could offer the testimony of an educational expert who had never observed the child at issue in the program at issue, making the expert's testimony likely less credible than the testimony of the school staff who observed the child in the educational setting. By contrast to both options, schools have at their disposal multiple experts—teachers, related services

16

providers, etc.—who observe the student multiple times and then could offer their testimony at a due process hearing, thereby giving the LEA an unfair advantage. Furthermore, at due process hearings, hearing officers assess the credibility of parents' and the District's expert(s); that credibility determination may hinge on the expert's observation of a special education student in the student's educational placement. Prohibiting an expert from observing may result in a credibility finding against parents further disadvantaging them when in litigation against the District.[10] The Supreme Court has acknowledged the LEA's advantage in due process litigation and noted that Congress leveled the playing field by mandating that schools protect parents' procedural rights and share information with them. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60 (2005).

Given the Student Rights Act's purpose, the choice this Hearing Officer imposes on parent's with respect to their educational expert is an entirely unreasonable result. "When possible, statutes should be interpreted to avoid 'untenable distinctions,' 'unreasonable results,' or 'unjust or absurd consequences.'" *Kaseman v. District of Columbia*, 444 F.3d 637, 642 (D.C. Cir. 2006) (quoting *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982)); *see also Validus Reinsurance, Ltd. v. United States*, 786 F.3d 1039, 1045-46 (D.C. Cir. 2015) ("[Together, two sections of the statute at issue] operate[] to level the playing field between domestic and foreign insurance and reinsurance businesses. Validus's interpretation would create a distinction that

---

[10] *See, e.g.*, Hearing Officer's Determination, D.C. Office of the State Superintendent of Education 6-7, 19, 22 (June 29, 2012), https://osse.dc.gov/sites/default/files/dc/sites/osse/publication/attachments/HOD.0612.14.pdf (The hearing officer made a credibility finding against the plaintiff because her expert made only one short observation while the DCPS witness worked with the student in the classroom, even though the plaintiff's requests for further observations were refused by DCPS and the hearing officer upheld that refusal.).

limits Congress's leveling purpose . . . . [Courts must] avoid statutory interpretations that bring

about an anomalous result when other interpretations are available.") (internal quotation marks

and citation omitted). This court should reject the HOD's interpretation of D.C. Code § 38-

2571.03 (5) and the unreasonable and unjust consequences that result from it.

Interestingly, the Hearing Officer who issued the HOD in this appeal reconsidered the

language of the statute and reached a different conclusion in a later matter that raised a similar

legal question.[11] A mere two-and-a-half months after issuing the HOD in this case, the same

Hearing Officer when ruling in another case, rejected his prior reasoning, writing:

> The HOD in Case #2018-0026[12] included language indicating that the Special
> Education Student Rights Act of 2014 prohibits observers from using the
> information from the observation for the purpose of "seeking or engaging clients
> in litigation against the District or the LEA." This was interpreted to mean that an
> observer who observes a student at a school may not testify about that
> observation, even in regard to litigation regarding the subject student. D.C. Code
> Sect. 38-2571.03 (5)(E). However, additional reflection leads to the conclusion
> that the words "seeking" and "engaging" in the statute are better read as a
> reference to an observer looking for, or working with, "new" clients. [The
> observer] Mr. Weinfeld did not use information from the observation to "engage"
> Petitioners. In a case like this one, the observer, Mr. Weinfeld, was already
> "engaged" with Petitioners through a contract at the time of the observation. The
> legislative history of this statute supports this view.

Attachment 2: July 8, 2018 Interim Order in Subsequent Case. The Hearing Officer was well

aware that he was reversing his prior interpretation. He inserted a footnote and quoted *Henslee v.*

*Union Planters Nat. Bank & Trust Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J. dissenting):

"Wisdom too often never comes, and so one ought not to reject it merely because it comes late."

---

[11] Plaintiffs were unable to file a Motion for Reconsideration or a Motion for Rehearing in light
of the Hearing Officer's reversal because the Office of the State Superintendent of Education
Office of Dispute Resolution does not accept such motions, stating that there is no provision in
IDEIA for their filing.

[12] This is the case number Plaintiffs appeal in this matter.

## IV.    The HOD in this case violates foundational principles of IDEIA.

IDEIA's "core . . . is the cooperative process that it establishes between parents and

schools." *Schaffer*, 546 U.S. at 53. The Supreme Court had previously acknowledged this:

> It seems to us no exaggeration to say that Congress placed every bit as much
> emphasis upon compliance with procedures giving parents and guardians a large
> measure of participation at every stage of the administrative process, as it did
> upon the measurement of the resulting IEP against a substantive standard.

*Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982) (citation omitted). IDEIA—in multiple

places—"emphasizes the participation of the parents in developing the child's educational

program and assessing its effectiveness." *Sch. Comm. of Burlington v. Dep't of Educ. of

Massachusetts,* 471 U.S. 359, 368 (1985) (citing 20 U.S.C. §§ 1400 (c), 1401 (19), 1412 (7),

1415 (b)(1)(A), (C), (D), (E), and 1415 (b)(2); 34 CFR § 300.345 (1984)). In fact, "the IDEA

requires that a school district do more than simply provide services adequate to meet the needs of

disabled students; it requires school districts to involve parents in the creation of individualized

education programs tailored to address the specific needs of each disabled student." *Brown v.

District of Columbia*, 179 F. Supp. 3d 15, 24 (D.D.C. 2016). Indeed, "the IEP meeting and the

IEP process more broadly are designed to be transparent, accessible, and interactive. When the

process works as intended, parents and other stakeholders are, at a minimum, able to provide

meaningful input to shape a student's education." *Id.* at 25.

In this case, the District's decision to prohibit the observer from entering the classroom

limited Ms. Woodson's participation in the IEP process and her ability to assess the effectiveness

of D.W.'s educational program. The Hearing Officer's requirement that Ms. Woodson relinquish

the ability to ask her designee with expertise in education to testify at a future hearing limits Ms.

Woodson's participation in the development of her child's special education program by

19

preventing her designated expert from observing D.W. without signing a document that prohibits him from testifying about his observation at a possible subsequent due process hearing.

## V.    Conclusion

For the foregoing reasons, Plaintiffs contend that the Hearing Officer erred as a matter of law in interpreting "seeking or engaging clients in litigation" to preclude Plaintiffs' designee with expertise in education from observing D.W. in his current educational placement and using that information to testify in any subsequent due process proceedings on behalf of this student about what he observed. Accordingly, this court should vacate the HOD. In addition, given the Hearing Officer's subsequent reconsideration of his initial interpretation of the Student Rights Act in the above-captioned matter, vacating that HOD will also allow these Plaintiffs the same access to school observations under the Student Rights Act as subsequent litigants have received.

Respectfully Submitted,

/s/ Caroline Wick
Caroline J. Wick*
Senior Attorney
Children's Law Center
501 3rd Street NW, 8th Floor
Washington, DC 20001
Phone: (202) 467-4900 x. 555
Fax: (202) 467-4949
Email: cwick@childrenslawcenter.org

*Authorized to practice under LcVR 83.2(g)

20

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of January, 2019, a copy of the foregoing Plaintiffs' Motion for Summary Judgment via the Case Management/Electronic Case Filing system on the following:

Pegah Ebrahimi Eftekhari
Assistant Attorney General
Suite 630 South
441 4th Street, NW
Washington, D.C. 20001

Respectfully Submitted,

/s/ Caroline Wick
Caroline J. Wick*
Senior Attorney
Children's Law Center
501 3rd Street NW, 8th Floor
Washington, DC 20001
Phone: (202) 467-4900 x. 555
Fax: (202) 467-4949
Email: cwick@childrenslawcenter.org

*Authorized to practice under LcVR 83.2(g)*

21

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| D.W., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 18-1824 (CRC) |
| v. | ) |
| | ) |
| THE DISTRICT OF COLUMBIA | ) |
| | ) |
| Defendant. | ) |

## [PROPOSED] ORDER

Upon consideration of the Plaintiffs' Motion for Summary Judgment, along with the related pleadings and any opposition thereto, it is the finding of this Court that the facts are not in dispute, that the Plaintiffs are entitled to judgment as a matter of law, and it is by the Court, this _____ day of _____, 2019, hereby

**ORDERED**, that Plaintiffs' Motion for Summary Judgment is hereby **GRANTED**; and it is further

**ORDERED**, that Plaintiffs' designee with expertise in education shall be allowed to observe D.W. in his educational placement with no restrictions, except those explicitly permitted by the Student Rights Act of 2014. D.C. Code §§ 38-2571.02 – 38-2573.01.

**IT IS SO ORDERED**.

_____
Magistrate Judge Deborah A. Robinson

Copies to:

Pegah Ebrahimi Eftekhari
Assistant Attorney General
Suite 630 South
441 4th Street, NW
Washington, D.C. 20001
pegah.eftekhari@dc.gov

Sarah Flohre
Supervising Attorney
Children's Law Center
501 3rd Street NW, 8th Floor
Washington, DC 20001
cwick@childrenslawcenter.org

Caroline Wick
Senior Attorney
Children's Law Center
501 3rd Street NW, 8th Floor
Washington, DC 20001
cwick@childrenslawcenter.org

# Attachment 1:
# Interim Order
# (July 8, 2018)



**District of Columbia**
**Office of the State Superintendent of Education**
Office of Dispute Resolution
1050 First Street, NE Washington, DC  20002
(202) 698-3819   www.osse.dc.gov

--------------------------------------------------------------------------------

|  |  |
|---|---|
| ▮▮▮▮ and ▮▮▮▮, ) through ▮▮▮▮, ) | **Date Issued: July 8, 2018** |
| **Petitioners,** ) | **Michael Lazan, Hearing Officer** |
| **v.** ) | **Case No.: 2018-**▮▮ |
| **District of Columbia Public Schools,** ) | |
| **Respondent.** ) | |

## <u>INTERIM ORDER</u>

This Due Process Complaint notice ("Complaint") was filed on March 28, 2018 by

Petitioners, who are the parents of the Student at issue ("the Student").  Petitioners raised the

following issues: 1) Did District of Columbia Public Schools ("Respondent" or ("DCPS") fail to

offer the Student a FAPE after being ordered to do so by IHO Coles Ruff on September 26,

2017?  If so, did DCPS fail to comply with IHO Ruff's HOD?  If so, did DCPS deny the Student

a FAPE?; 2) Did DCPS fail to provide the Student with an appropriate educational program for

the 2017-2018 school year?  If so, did DCPS act in contravention of 34 CFR 300.320, <u>Endrew F.</u>

<u>v. Douglas County School District</u>, 137 U.S. 988 (2017), and <u>Hendrick Hudson Bd. Of Educ. v.</u>

<u>Rowley</u>, 458 U.S. 176 (1982)?  If so, did DCPS deny the Student a FAPE?; and 3) Did DCPS

fail to provide the Student with an appropriate educational placement/location of services for the

2017-2018 school year?  If so, did DCPS act in contravention of some of the principles in such

cases as <u>Gellert v. District of Columbia</u>, 435 F. Supp.2d 18 (D.D.C. 2006)? If so, did DCPS deny

the Student a FAPE?

1

DCPS moved to dismiss on May 14, 2018.  DCPS's motion to dismiss was granted in part, resulting in a ruling that Petitioners may not raise claims relating to the sufficiency of specialized instruction hours in the Student's IEP.  Hearings were scheduled for June 11, 2018, and June 18, 2018.  With little time left before the start of trial, on the afternoon on June 8, 2018, DCPS moved to strike one of Petitioners' witnesses, Rich Weinfeld.  DCPS indicated that Mr. Weinfeld had observed the Student at the Student's school and that the Special Education Student Rights Act of 2014 does not allow experts to observe a student at a school and then engage clients in litigation against it.  DCPS also argued that the observation was improperly secretive, since counsel had requested notice of the observation and did not receive it.  DCPS therefore requested that Mr. Weinfeld be barred from testifying, and that witnesses should be barred from relying on information gained during the observation.

Petitioners opposed this motion, and the hearing dates were adjourned to allow the parties to brief the issue.  On June 15, 2018, Petitioners submitted opposition papers to the motion to strike.  Petitioners called the motion "nonsensical" and stated that the motion would create a "shambles" of the law, which was written to benefit students and parents.  Petitioners pointed to a recent federal court decision, Middleton v. D.C., No. 17-88, 2018 WL 2582591 (D.D.C. June 4, 2018), where a DCPS school refused to permit an observation unless the observer signed a detailed document.  Petitioners underscored that the court held that DCPS impermissibly restricted the educational advocate's observation and found that DCPS denied the student a FAPE, reversing a hearing officer.  Petitioners also argued that Mr. Weinfeld has been providing services for the family for years, is not representing the family in this hearing, and did not observe, "for the purpose of seeking or engaging clients in litigation against the District or the LEA."  Petitioners contended that Mr. Weinfeld does not have a financial interest in the outcome

2

of the hearing because he is being paid by the parents to be there. Petitioners contended that the parents, if they prevail, may recoup some of their expenses for his expertise during that hearing. Petitioners pointed to District of Columbia v. Nahass, 699 F. Supp. 2d 175, n.10 (D.D.C. 2010), arguing that it is the parents who seek attorneys' fees in IDEA cases, not lawyers. Finally, Petitioners argued that if such experts or designees were barred from testifying, there would be no need for experts to conduct observations. Petitioners argued that a law allowing experts to observe but barring the experts from testifying because they were being paid would be irrational.

On June 20, 2018, DCPS submitted a reply, indicating that Middleton is not on point and again indicating that it seeks to bar the witness from disclosing "any information obtained during the course of an observation for the purpose of seeking or engaging clients in litigation against the District or the LEA."

## CONCLUSIONS OF LAW

Prior to 2014, in the District of Columbia, parents and their designees were not allowed unfettered access to observe students at their public schools. Letter to Mamas, 42 IDELR 10 (OSEP letter, May 26, 2004); see also Letter to Blades, 213 IDER 169 (OSERS letter, August 12, 1988)(indicating that local or State procedures control where a parent requests observation by professional under parent hire). The District of Columbia, armed with the discretion to allow such observations if it so chose, opted to change this rule of law in 2014. Accordingly, the Special Education Student Rights Act of 2014 provides as follows:

> Upon request, an LEA shall provide timely access, either together or separately, to the following for observing a child's current or proposed special educational program: (i) The parent of a child with a disability; or (ii) A designee appointed by the parent of a child with a disability who has professional expertise in the area of special education being observed or is necessary to facilitate an observation for a parent with a disability or to provide language translation assistance to a parent; provided that the designee is neither

3

> representing the parent's child in litigation related to the provision of free and appropriate public education for that child nor has a financial interest in the outcome of such litigation.

D.C. Code Sect. 38-2571.03(5)(A).

This law also provides that:

> An observer shall not disclose nor use any information obtained during the course of an observation for the purpose of seeking or engaging clients in litigation against the District or the LEA.

D.C. Code Sect. 38-2571.03(5)(E).

The legislative history for these sections emphasizes the importance of observations. In their Committee Report, The Committee on Education of the Council of the District of Columbia called observation "a critical tool available to parents with respect to the development and monitoring of their child's special education program." Council of the District of Columbia Committee on Education, Committee Report (July 10, 2014) (http://lims.dccouncil.us/Download/31379/B20-0723-CommitteeReport1.pdf).

The statute, however, does not grant unlimited access to designees. The statute restricts access to designees who have a financial interest in the outcome of current litigation. The reference to "financial interest in the outcome in the litigation" can be viewed as a reference to another, major section of the Special Education Student Rights Act of 2014 which, over opposition from LEAs, allows for reimbursement to parents for reasonable expert witness fees if the outcome of the litigation is in the parents' favor.[1]  D.C. Code 38-2571.03(7)(A); see also Committee Report (attached letters from advocates and LEAs).

---

[1] Previously, there was no such right in the District of Columbia.  Arlington Cent. Sch. Dist. v. Murphy, 548 U.S. 291 (2006).

4

Petitioners contended that there is no "financial interest" to the designee because Mr. Weinfeld is being paid by the parents, and the statute provides that expert witness fees must be paid *to the parent*, not to the expert. This argument is not clearly contested by Respondent. Instead, Respondent relied on language in an earlier decision by this Hearing Officer, Matter of Student v. DCPS, ODR Case # 2018-0026, where an observation by a designee was ordered. The HOD in Case #2018-0026 included language indicating that the Special Education Student Rights Act of 2014 prohibits observers from using the information from the observation for the purpose of "seeking or engaging clients in litigation against the District or the LEA." This was interpreted to mean that an observer who observes a student at a school may not testify about that observation, even in regard to litigation regarding the subject student. D.C. Code Sect. 38-2571.03(5)(E).

However, additional reflection leads to the conclusion that the words "seeking" and "engaging" in the statute are better read as a reference to an observer looking for, or working with, "new" clients.[2] Mr. Weinfeld did not use information from the observation to "engage" Petitioners. In a case like this one, the observer, Mr. Weinfeld, was already "engaged" with Petitioners through a contract at the time of the observation. The legislative history of this statute supports this view. There is nothing in the legislative history to indicate that there is any prohibition against observers testifying in cases involving the subject student, even though the legislative history does discuss various measures that were implemented to safeguards the rights of LEAs in connection to observations. As the Committee Report states:

> B20-723 follows these models and ensures that parents, or their designees, have the opportunity to observe their child's instruction, while also establishing a series of limitations to address concerns raised by LEAs. LEAs may require advance notice of observations

---

[2] Cf. Henslee v. Union Planters Nat. Bank & Trust Co., 335 U. S. 595, 600 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late.").

and that any designation by the parent of an observer be done in writing. These limitations enhance school security and serve to reduce any potential disruption. In addition, this act would allow for the school to ensure that an observer does not disclose confidential information regarding other children in the program.

Committee Report, at p. 4.

DCPS also contended that Mr. Weinfeld's observation was "secretive," because Petitioners were told to contact DCPS counsel prior to the observation, and to provide counsel with written notice of the name of the individual who was to observe. Per D.C. Code Sect. 38-2571.03(F), the LEA may require advance notice and may require the designation of a parents' observer to be in writing. While this Hearing Officer agrees that Petitioners should have notified counsel as a professional courtesy, they did notify DCPS of Mr. Weinfeld's observation since it is undisputed that DCPS, and the Student's school, were aware of the scheduling of the observation through emails. (Petitioners' Exhibit A). There is nothing in the statute that requires that counsel specifically be notified, though it certainly would have been more appropriate to do so in this instance.

## ORDER

As a result of the foregoing, DCPS's motion is denied

Dated: July 8, 2018

*Michael Lazan*

Impartial Hearing Officer

cc:    Michael Eig, Esq.
       Daniel McCall, Esq.
       OSSE Office of Specialized Education {due.process@dc.gov}
       ODR

6