**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| D.W., et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 18-1824 (CRC)** |
| v. | ) | |
| | ) | |
| THE DISTRICT OF COLUMBIA | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS
NO GENUINE ISSUE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Plaintiffs hereby submit the following Statement of Material Facts as to Which There is No Genuine Issue:

1. Plaintiff Arika Woodson is D.W.'s mother. R. at 1078.

2. Plaintiffs are residents of the District of Columbia. *Id.* at 19.

3. Plaintiff D.W. is a nine-year-old disabled child, as defined by the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400 – 1482 and he is eligible to receive special education and related services. R. at 7.

4. D.W. has multiple disabilities, including asthma, allergies, Cerebral Palsy (mild), global developmental delays, Angelman Syndrome,[1] and Agenesis of the Corpus Callosum.[2] *Id.*

5. Academically and developmentally, D.W. is several years behind his same-aged peers. *Id.* at 153. D.W.'s receptive language skills are more advanced than his expressive language skills; expressively he has presented as nonverbal. *Id.* at 59. However, D.W. can point to pictures

---

[1] Angelman syndrome is a rare neurogenetic disorder . . . Characteristics or symptoms of Angelman syndrome include developmental delay, lack of speech, seizures, and walking and balance disorders." "What is Angelman syndrome?", Angelman Syndrome Foundation, https://www.angelman.org/what-is-as (last visited January 10, 2019).

[2] Agenesis of the Corpus Callosum is a birth defect that occurs when the corpus callosum—the nerve fibers that connect the two hemispheres of the brain—does not develop properly. Symptoms and the degree of symptoms may vary, but can include seizures, cognitive impairment and developmental delays. "Pediatric Agenesis of the Corpus Callosum," Children's National Health System, https://childrensnational.org/choose-childrens/conditions-and-treatments/fetal-carepregnancy/agenesis-of-the-corpus-callosum (last visited January 10, 2019).

1

and use vocalizations, body movements, eye gaze, and sign language to communicate. *Id*. at 104, 234.

6.  In second grade (2016-2017 school year), pursuant to D.W.'s Individualized Education Program ("IEP") he was placed in a self-contained classroom inside a general education school.[3] *Id*. at 59. D.W.'s IEP included the service of a dedicated aide. *Id.* at 60.

7.  When D.W. reached the end of second grade, the District notified Ms. Woodson that at the start of the third grade (2017-2018 school year), D.W. would be removed from the general education school and placed in a special education school that only serves disabled students. *Id*. at 62.

8.  Ms. Woodson opposed removing D.W. from a school that serves typically developing students and she had a specific concern about the proposed school: it contains a pool which is dangerous for students diagnosed with Angelman Syndrome. *Id*. at 68. Children diagnosed with Angelman Syndrome are attracted to water and Ms. Woodson was concerned that D.W. would be preoccupied by the swimming pool. *Id*. at 62.

9.  When the District and Ms. Woodson could not reach an agreement about D.W.'s placement for the start of D.W.'s third grade year, Ms. Woodson filed a due process complaint—separate from the due process complaint at issue in this appeal—to challenge the District's decision to place D.W. in a special education school (hereinafter 2017 DPC).[4] *Id*. at 56.

10. Along with her 2017 DPC, Ms. Woodson filed a motion for "stay put" protections to ensure that D.W. would not be moved to a more restrictive educational placement before the resolution of the 2017 DPC. *Id.* at 101.

11. While the 2017 DPC was pending, the District and Ms. Woodson agreed that to comply with the "stay put" provisions of IDEIA, D.W. would be placed in a self-contained classroom in a general education school for the 2017-2018 school year; however, D.W. would attend a different general education school than he had during the 2016-2017 school year.[5] *Id*. at 63. D.W. had to move to a different general education school because he aged out of the classroom at the general education school he attended during the 2016-2017 school year. *Id.* at 178.

---

[3] For full context of the instant matter, this motion provides facts that preceded the initiation of the due process complaint at issue here, including reference to prior, related litigation.

[4] Ms. Woodson also challenged the District's decision to remove the dedicated aide from D.W.'s IEP. R. at 58. However, this issue was resolved when D.W.'s IEP was amended to continue providing a D.W. a dedicated aide. *Id.* at 58-59.

[5] The Individuals with Disabilities Act (IDEA) was originally passed in 1997. In 2004, Congress re-authorized IDEA and named it the Individuals with Disabilities Improvement Act (IDEIA). The acronyms IDEA and IDEIA are often used interchangeably to refer to the re-authorized legislation passed in 2004.

12. After the 2017 DPC was filed and after D.W. began attending school at his "stay put" placement, Ms. Woodson asked that her designee with expertise in education, Dr. Paul Livelli, observe D.W. in his new placement pursuant to the Student Rights Act. *Id*. at 194-95.

13. The District refused Ms. Woodson's request stating that it did not believe she was entitled to an observation of D.W. in an "interim LOS [Location of Service]." *Id*. at 193-94.

14. Ms. Woodson filed a motion requesting that her designee be allowed to observe D.W. in the new placement. *Id*. at 181-95. Ms. Woodson argued that the "observation is not only necessary to ensure the [Plaintiff] is not prejudiced in litigation, but also to help inform the [Plaintiff] as she continues to participate in the special education process through litigation." *Id*. at 182.

15. The Hearing Officer denied Ms. Woodson's motion at the start of the hearing regarding the 2017 DPC. *Id*. at 58. The Hearing Officer found that Plaintiff sought the observation order for the purpose of litigation and that the designee "has at least a potential financial interest in the outcome of the litigation." *Id*.

16. The Hearing Officer issued his determination regarding the 2017 DPC on November 4, 2017. *Id.* at 55. The determination addressed the District's proposed placement of D.W. at a separate special education school. *Id*. at 55-74.

17. The Hearing Officer found that the District denied D.W. a Free, Appropriate Public Education (FAPE) by proposing to place D.W. in a more restrictive environment without assessing and understanding D.W.'s needs. *Id*. at 68. The Hearing Officer noted that D.W. might have been able to stay at the first general education school he was placed at if the District had put in place assistive technology and other accommodations. *Id*. The Hearing Officer wrote: "While there is appreciation for [D.W.'s] learning difficulties and slow progress, it is unclear whether these difficulties are part and parcel of the student's non-verbal state and lack of appropriate tools for effective communication." *Id.* at 68.

18. The Hearing Officer ordered that the District conduct an Assistive Technology Evaluation and a Psychological Evaluation for D.W. and that the District review and revise D.W.'s Individualized Education Program (IEP) in light of the evaluations. *Id*. at 69.

19. The District completed the two evaluations in November and December 2017. *Id.* at 143-55, 218-25.

20. The Psychological Evaluation includes three school-based observations of D.W by the school psychologist, a District employee. *Id*. at 149-51. The Psychological Evaluation also includes interviews with five District employees that worked in the school setting with D.W. at the time. *Id*. at 147-49.

21. The Assistive Technology Evaluation includes two school-based observations of D.W. by the Specialist in Assistive Technology, also a District employee. *Id*. at 221-22. The Assistive

3

Technology Evaluation includes interviews with three District employees that worked with D.W. in the school setting at the time. *Id*. at 221.

22. On December 12, 2017, Ms. Woodson requested that her designee with expertise in education, Dr. Paul Livelli, likewise be allowed to observe D.W. "to help inform [Ms. Woodson's] participation in the special education process at an upcoming meeting to review evaluations and discuss his performance." *Id*. at 217.

23. The District refused to allow the observation citing the November 2017 HOD. *Id*.

24. On January 22, 2018, the District convened an IEP meeting to review D.W.'s evaluations. *Id*. at 9.

25. At the January 22, 2018, IEP meeting multiple District staff members who work with D.W. on a regular basis in the school setting attended, including two teachers, a school representative, and the evaluators who observed D.W. in the classroom. *Id*. at 492-93, 511-21.

26. After the IEP meeting, the District provided Ms. Woodson with an Amended IEP that included a new page and indicated D.W.'s placement was a separate day school. *Id*. at 9-10. However, D.W. did not move to the special education school and remained placed in the self-contained classroom at the general education school. *Id.* at 7.

27. On February 2, 2018, Ms. Woodson filed the due process complaint that initiated the proceedings in this appeal (hereinafter 2018 DPC). *Id*. at 18-29. Plaintiffs raised one issue: that the District had denied D.W. a FAPE by refusing to allow Ms. Woodson's designee with expertise in education to observe D.W. in his current educational placement. *Id*. at 28.

28. The 2018 DPC was assigned to and heard by a different Hearing Officer than the first due process complaint. *Id.* at 13, 70.

29. The District filed a Response to the 2017 DPC on February 9, 2018. *Id.* at 36-74.

30. On February 22, 2018, the District filed a Motion to Dismiss. *Id*. at 77-119.

31. On February 26, 2018, Plaintiff filed Petitioner's Opposition to Respondent's Motion to Dismiss Petitioner's Due Process Complaint. *Id*. at 122-249.

32. On March 6, 2018, the Hearing Officer convened a Prehearing Conference during which he heard arguments on the Motion to Dismiss. *Id.* at 4. The Hearing Officer invited the parties to submit additional argument and authority. *Id.* At the Prehearing Conference the parties agreed that the 2018 DPC could likely be resolved without a hearing as there was no dispute regarding material facts. *Id.* at 252.

33. On March 9, 2018, the Hearing Officer issued a Prehearing Order. *Id.* at 250-53.

34. On March 11, 2018, Plaintiff filed Petitioner's Supplemental Authority and Argument in Support of Petitioner's Opposition to Respondent's Motion to Dismiss. *Id.* at 724-32.[6]

35. On March 13, 2018, Plaintiff filed additions to the March 9, 2018, Prehearing Order. *Id.* at 256-58.

36. On March 19, 2018, the District filed a Supplemental Motion to Dismiss. *Id.* at 262-70.

37. On March 22, 2018, Plaintiff filed an opposition to the District's Supplemental Motion to Dismiss. *Id.* at 273-80.

38. On March 22, 2018, the Hearing Officer convened a second Prehearing Conference the parties again agreed the 2018 DPC could be resolved based upon the pleadings. *Id.* at 5.

39. On March 27, 2018, Plaintiff filed a Motion for Judgment, including a Proposed Statement of Material Facts As To Which There Is No Genuine Dispute. *Id.* at 286-460.

40. On March 27, 2018, the District filed its Disclosure Statement along with the accompanying disclosures. *Id.* at 461-564.

41. On March 28, 2018, the Hearing Officer issued an Interim Order stating that the 2018 DPC would be decided based on the papers already submitted. *Id*. at 565.

42. On March 30, 2018, Defendant filed an Opposition to Plaintiff's Motion for Summary Judgment. *Id*. at 569-80. The District did not dispute the Proposed Statement of Material Facts As To Which There Is No Genuine Dispute. *Id.* at 973.

43. On April 3, 2018, Plaintiff filed a Reply to the District's Opposition to Plaintiff's Motion for Summary Judgment. *Id.* at 583-97.

44. On April 12, 2018, the District filed an Unopposed Motion for Continuance. *Id.* at 602-03.

45. On April 18, 2018, the Hearing Officer issued an Interim Order on Continuance Motion. *Id*. at 606-07. The Hearing Officer stated that he needed time to consider the pleadings that had been filed. *Id.* at 606. He stated that if both motions were denied the parties would convene for a hearing on May 8, 2018. *Id.*

---

[6] Plaintiff's Supplemental Authority and Argument in Support of Petitioner's Opposition to Respondent's Motion to Dismiss was not included in the Administrative Record as one of the Hearing Officer exhibits. It is included as the record because Plaintiff filed it as part of her disclosures prior to the hearing.

46. On April 30, 2018, the Hearing Officer issued an Interim Order denying both the District's Motion to Dismiss and Plaintiff's Motion for Summary Judgment. *Id*. at 981. The Hearing Officer stated that a hearing would proceed as scheduled. *Id*.

47. On May 1, 2018, Ms. Woodson filed her Disclosure Statement along with the accompanying disclosures. *Id.* at 610-923. The District also filed its Supplemental Disclosure Statement along with the accompanying disclosures. *Id*. at 924-32.

48. An evidentiary hearing was held on May 8, 2018. *Id*. at 6. The hearing involved a sole issue: "Did [the District] deny the [Plaintiff's] expert an opportunity to observe the Student's classroom in violation of the Special Education Student Rights Act, located at D.C. Code Sect. 38-2571.03 (5)(A)?" *Id.* at 7. The Student Rights Act of 2014 states:

> Upon request, an LEA shall provide timely access, either together or separately, to the following for observing a child's current or proposed special education program: (i) The parent of a child with a disability; or (ii) A designee appointed by the parent of a child with a disability who has professional expertise in the area of special education being observed or is necessary to facilitate an observation for a parent with a disability or to provide language translation assistance to a parent; provided that the designee is neither representing the parent's child in litigation related to the provision of a free and appropriate education for that child nor has a financial interest in the outcome of such litigation.

D.C. Code § 38-2571.03 (5)(A). The Student Rights Act also provides: "An observer shall not disclose nor use any information obtained during the course of an observation for the purpose of seeking or engaging clients in litigation against the District or the LEA." *Id.* at § 38-2571.03 (5)(E).

49. At the hearing, Respondent presented one witness, a compliance case manager for the District. *R.* at 6.

50. Plaintiffs presented three witnesses: Dr. Paul Livelli; Ms. Woodson; and Mr. Richard Weinfeld, the Executive Director of Weinfeld Education Group, "WEG." *Id*.

51. Dr. Livelli was admitted as an expert in special education programming and placement. *Id*. at 1004. He testified that he is an independent educational consultant who subcontracts for WEG. *Id*. at 1004-05.

52. Dr. Livelli testified about the importance of observations to his work as they allow him to understand how a child behaves in the classroom and how that child responds to the teacher's instruction. *Id*. at 1005. Dr. Livelli also testified that he needs to observe D.W., so he can understand how D.W. receives instruction from the teacher versus his dedicated aide and whether the assistive technology assists D.W. in the classroom, etc. *Id.* at 1008-09.

53. Dr. Livelli testified that he has never accepted a contingency fee agreement. *Id*. at 1013.

54. Mr. Weinfeld was admitted as an expert in special education programming and placement. *Id*. at 1033.

55. Mr. Weinfeld testified that WEG has never accepted a contingency fee agreement. *Id*. at 1038-39. Mr. Weinfeld testified about his work as an educational consultant and the importance of observations to his work. *Id*. at 1041-42.

56. Ms. Woodson testified that she requested that Dr. Livelli observe and that her participation in the January 22, 2018, IEP meeting was impacted because she had wanted a non-District employee to observe D.W. before the meeting. *Id*. at 1079-81. Ms. Woodson also testified that she had observed D.W. in his educational program but the observation was not helpful because she did not know exactly what she was looking for. *Id*. at 1090.

57. On May 11, 2018, Plaintiff filed a Supplemental Closing. *Id*. at 963-69.

58. On May 18, 2018, the Hearing Officer issued his determination. *Id*. at 3-15.

59. The Hearing Officer ruled:

    1. Petitioner's request for [Dr. Livelli] to observe the Student at Student's school is granted;
    2. Before this observation, DCPS may require Witness A to sign a document under oath affirming that he will not use the information obtained through the observation: 1) in any subsequent special education litigation against DCPS; and 2) in an effort to retain additional clients so that they can engage in special education litigation against DCPS

    *Id*. at 13.

60. Since the Hearing Officer issued the determination regarding the 2018 DPC, the same Hearing Officer has reversed his interpretation of the statutory language at issue in this matter. In a July 8, 2018, Interim Order in a different matter that concerned a similar legal question he found:

    The HOD in Case #2018-0026[7] included language indicating that the Special Education Student Rights Act of 2014 prohibits observers from using the information from the observation for the purpose of "seeking or engaging clients in litigation against the District or the LEA." This was interpreted to mean that an observer who observes a student at a school may not testify about that observation, even in regard to litigation regarding the subject student. D.C. Code Sect. 38-2571.03 (5)(E).

---

[7] This is the case number Plaintiffs appeal in this matter.

However, additional reflection leads to the conclusion that the words "seeking" and "engaging" in the statute are better read as a reference to an observer looking for, or working with, "new" clients. [The observer] Mr. Weinfeld did not use information from the observation to "engage" Petitioners. In a case like this one, the observer, Mr. Weinfeld, was already "engaged" with Petitioners through a contract at the time of the observation. The legislative history of this statute supports this view.

Attachment 1: July 8, 2018 Interim Order in Subsequent Case (footnote omitted).

61.   Plaintiffs filed a Complaint in United States District Court for the District of Columbia on August 3, 2018, appealing the Hearing Officer's Determination, and requesting that this Court order that the District allow Plaintiff's designee with expertise in education to observe D.W. in his current educational placement without any restrictions outside those enumerated in the Student Rights Act of 2014, D.C. Code § 38-2571.02 – 38-2573.01.

Respectfully Submitted,

/s/ Caroline Wick

Caroline J. Wick
Senior Attorney
Children's Law Center
501 3rd Street NW, 8th Floor
Washington, DC 20001
Phone: (202) 467-4900 x. 555
Fax: (202) 467-4949
Email: cwick@childrenslawcenter.org

8

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of January, 2019, a copy of the foregoing Plaintiffs' Statement Of Material Facts as to Which There is No Genuine Issue was served via the Case Management/Electronic Case Filing system on the following:

Pegah Ebrahimi Eftekhari
Assistant Attorney General
Suite 630 South
441 4th Street, NW
Washington, D.C. 20001

Respectfully Submitted,

/s/ Caroline Wick
Caroline J. Wick*
Senior Attorney
Children's Law Center
501 3rd Street NW, 8th Floor
Washington, DC 20001
Phone: (202) 467-4900 x. 555
Fax: (202) 467-4949
Email: cwick@childrenslawcenter.org

*Authorized to practice under LcVR 83.2(g)